Good morning, Your Honors. Paul Derby for the plaintiffs. There's a phrase in the investment community, picking up pennies in front of a steamroller, and that's kind of what the investment strategy of these defendants was in this case. To try to simplify what's fairly complex, the investment strategy of the structured alpha funds run by Allianz, and this was all transparent, this was all readily accessible at the outset and through monitoring during the course of the investment, where the investments were, the alpha versus the beta part of the investments, the 20 percent at issue here. Those investments were a combination of highly leveraged derivatives, derivatives based upon a volatility index, just like that sounds, high risk, high fluctuations that require both steady monitoring... I just want to be clear about something. You're not asking for actual loss that you've received, but it was almost a relative loss, correct? It is a relative loss. If you were to give someone your money and invest it, you'd expect 30 years later you'd come back to more money. And in fact, you'd expect that that growth, if someone were capably investing it, would exceed inflation and in fact produce some form of a retirement. Here, while it's stated as an unannualized 15 percent return, that's three percent over a period of time where the market did extremely well prior to COVID. And so under a normal, an appropriate investment strategy, a prudent investment strategy for a retirement fund, that money would have been invested somewhere that wasn't subject to effectively an overnight loss. I think the district court said that if you followed that analysis, wouldn't you be engaging in sort of some speculative guessing at that point, aren't you? Well, you have to make an assumption as to what the appropriate investment or the prudent investment would have looked like. That's a legal determination. At the point that you have what a prudent investment would have looked like, you can calculate it to the penny. And so the math on what a prudent investment generates versus the losses, the relative losses here, that's readily calculable. The only question is the legal decision that's made on the front end of that, which is what's required by the law, is that that's the call versus summa tommo decision, is determine what a prudent investment looks like, and then we just do the math. And here — So can I ask — it seems like you eventually did the math, but there's the original complaint and the amended complaint without the to-the-penny calculation. Can you explain why and whether we should consider what you did originally to be enough? Well, I don't think that in the complaint itself that we have to allege, I don't believe anything more than tens of millions of dollars. There's obviously some expert analysis that will go into that. There may be alternatives in terms of what a prudent investment looks like that may generate different calculations. And so I don't know — and I'm also just doing that math, but I don't know that at this early stage saying something other than it's a whole lot of money, tens of millions of dollars that would have been generated in the event of a prudent investment is required. But certainly if we were to be required to make an initial calculation to the penny, which may change over the course of the lawsuit depending upon inputs, that would just be leave to amend. I mean, if the absence of a to-the-penny as opposed to tens of millions of dollars calculation is the bugaboo, we could simply change the complaint to correct that very quickly. The point of picking up pennies with a steamroller is that in understanding why this is such a particularly bad investment, the 20 percent that is the alpha, the high-risk portion of the investment, it doesn't really get hedged by the 80 percent because the 20 percent isn't your normal 20 percent loss. You think of that as if you lost 100 percent of that, well, you still got 80 percent of the funds. But that's not true here because the uncovered call options require the funds to go back to the market and acquire the stock that's not already in their ownership. And so instead you have this small, the pennies, commissions that are being paid so as to generate the profit in the alpha section of the funds. But if those, if the market declines significantly, the funds have to go get that stock. And so they have to buy that stock. If it's $100 security, they have to spend that $100 on, say, $5 of a commission. And so that 20 percent can gobble up the remaining 80 percent. It's a unique set of circumstances that exposes the funds to the risk of total loss, the exact opposite of what would be a prudent investment for not just on the cusp of retiring, but some of these people are actually in their retirement. They are living off of these defined contribution plans, and they don't have the fat in their monthly income to be able to lose 20, 30, 40 percent. So this argument you're making seems more like a merits argument than a standing argument. At this stage, do we just have to decide if you have standing to make this argument later? It is a merits-based argument, and we viewed the court's opinion as somewhat merits-based, significantly merits-based. And so I think the whole process is maybe a little ahead of its skis. But I do agree, obviously, standing is the initial issue. In terms of injury in fact, I mean, even the respondents at page 28 and 31 of their brief are walking back the actual basis of the district court's order, which is that relative loss can't be injury in fact. Here, we've alleged there's no contrary evidence. The only evidence on the Allen Declaration is the math that we agree with in terms of a $38.6 million net gain over somewhere between four to six years, depending upon where the investment was initially made. So a long-winded answer, Your Honor. Yes, I think there has to be a standing determination. But I think on injury in fact, the respondents themselves have backpedaled that into a pleading issue. So should we stop at standing and send back, if we followed your position? Well, if there is standing, I think the court can also resolve the 12B6 issue. It's de novo. And I think that this court can say that the 62 pages and 224 paragraphs of the First Amendment complaint are fulsome and that we should get on with discovery, I believe. I'd certainly prefer that to a loss. But if we thought that you needed to have the by the penny calculation, then you're also saying you could just amend to add that and then get on with it. Yes. If that's the only hurdle, I mean, we could attempt that in full disclosure. I think that's a little premature. I think that's a process driven by the experts. I think that... Well, don't you already have the Pomerantz Declaration? We do. We do. That number could easily be inserted. And in fact, one of the things we argued is that even if the court — and it's a very short-to-the-point opinion. It felt sort of like, let's get done with this. But the Pomerantz Declaration, even if you don't consider it as evidence — and there's no need. There's no evidentiary dispute. Absolutely. It's a road map for the amendment. And so if the dollar amount simply needs to be cut and pasted into the complaint, that's an easy fix. If I may reserve my remaining time. Sounds good. Thank you, Your Honor. I believe there are a lot of summer associates from various law firms in the courtroom this morning. We're happy to have them here. It's great. That's the reason why it's so crowded. Thank you. And may it please the Court, John Hamill, on behalf of the defendants. Let me start by saying that it is quite clear, as the district court found, that the plaintiffs gained. And their pleadings did not establish that. They gained. They did not lose. They're trying to... So why is that the relevant question, though? I mean, if you invest money for a in the stock market, if that's all you've gained. So I don't understand how that could be an answer to this. Sure. It's a relevant question because under this court's precedent, once it's been established that they gained, and once proof has been put on that they gained, and they came before the district court with an emphatic position in their pleadings that they lost, it was then our role, as we did, our proper procedure, which we invoked, to put evidence before the district court that they gained, thereby refuting the allegations in the complaint. But why do you believe that they didn't allege relative loss in this case? I guess that's... I'm not sure if I'm capturing that argument. Because under your precedent, under your precedent, once we have established that the pleadings were incorrect... Travel with me for a minute on this. Once we establish with evidence that the pleadings are incorrect, the pleadings pleaded a loss. That loss was not true. We established that they gained. The district court no longer has to accept the allegations in the complaint as true. That's your law in this circuit. So now the plaintiffs, it's incumbent upon them to come forward with evidence that they have lost. All they came forward with was speculation. Even as to this relative loss concept, which is barely in the complaint, even as to this... So you admit that it is in the complaint? They have allusions to the concept of a relative loss. In a couple of paragraphs of the complaint, they allude to the concept. At 47 and 51, I thought. I'll go with you on the paragraphs. I'll trust your citations. There are allusions to the concept. But even if we play that out, it's just speculation because what they don't do is plead a benchmark. When we look at the benchmark concept... Well, why can't we just send it back to the district court to allow for amendment? Well, for two reasons. First of all, because once they have failed to plead the benchmark, you certainly can look at all reasons that are set forth in the record. This court has to know the review. If you wanted to look at it as a 12B6 ground, you could do that. All grounds that are apparent in the record, you could rule upon. So you could rule on that. But even as a matter of standing, the benchmark requirement has to be there to show injury and causation. Whether we look at that as a 12B1 concept... Do they need the math to have standing? Do they need to set forth the exact calculation? I think we were having a conversation with your friend on the other side about what actually needs to be pledged. Do they need to plead the math to have standing? Certainly, they have to do a lot more than what they've done here. So let's play this out. When we look at this court's precedent, for starters, they can't just point to an index fund. They can't just say... Well, why not? Why not? I mean, they've pointed to the Russell 1000. Why can't they just point to that as what would have been the investment? Because you've said they can't. You said they can't in the Miners case. You said they can't in the Davis and Salesforce case. All the other circuits have said they can't. Metsusek said that in the Fourth Circuit. The Seventh Circuit said that they can't do that in the Albert case. The courts have been very clear from 2019, from 2022, and even going back farther, that they can't just point to an index fund. They can't just point to passive investments. All that this Pomerantz declaration did, all that it did was say, well, you know what? There are index funds out there. He points to a Treasury-based index fund, and he points to an equity-based index fund. And he says, gee, gosh, there's something else out there that may have done better. The law, as it is involved, says that's not enough. Okay, so can you answer my question, which is, what is enough? Do they have to set forth the calculation, the math, to establish standing, or the 12B6 issue? Yes, they certainly have to do a lot more than what they've done. Here's what's enough. Here's what's enough. First thing they have to do is they have to look at some other set of investments that are a proper benchmark to compare to. They didn't do that. It's not an index fund. That much is certain. It is certainly not an index fund. Your law and the law of the other circuits says that it has to be a totality of the circumstances. So whatever it is, it's not an index fund. Second thing, they have to look at the real world. We all know what really happened here. We don't have to don blinders. What really happened here? We have to look at events that occurred. What happened in the real world? There were guilty pleas, and there were a consent decree. We know what happened. What the law says is we can't look at hindsight. This entire complaint is built on hindsight. So what has to happen? We have to go back to 2014 and 2016. That's when these investment decisions were made, and we have to say what was done at that time. At that time, let's look what happened at that time. The board, in its fiduciary capacity, selected an investment advisor in Cowen. That's in the complaint. Reputable investment environment. No hindsight. Remember, your law says no hindsight. Cowen reputable. Perfectly lawful. Isn't what happened in the real world is that the board read the private placement memorandum for the Alpha Fund, which clearly stated that it was speculative and entailed substantial risks. Isn't that what happened in the real world? They were aware of that. It's, you know, they disclaimed the fact that they relied on these statements made by the fraudulent actor. In fact, they said we didn't consider that when we made these investments. No, I think what happened in the real world is that those disclaimers are the same disclaimers that are put in any investment, right? Every investment that's out there says there's risk inherent in investments. There's nothing new about that. If we look in, if I may, Your Honor, using this phrase, the real world, I know we're having exchange on it. If we look at what's in the word fair enough, it is my word, but it's because it's the word that matters, right? And that's what Judge Kuhnhauer certainly looked at. If we look at the judicially noticeable materials at what was going on, and we look at what happened in the SEC consent decree and in the guilty pleas, we see that the fraud that was going on was that the risks inherent in these investment vehicles were not disclosed, not to the Board, not to the investment community at large. All the Board was seeing was that the  They just need to plead at the motion-to-dismiss stage that the Board did not, that there wasn't a break in the causal link, that, in fact, the Board knew information upon information and belief. They are alleging that the Board had the documents that very clearly indicated the speculative nature of this fund. No, Your Honor, I disagree. I think what you would have to do to issue a ruling that went along those lines is you would have to change the hindsight rule into a foresight rule because there is no rule, and the law is very clear on this. There's no rule that there's a per se imprudent investment. None. Period and hard stop. The law is very clear on that. So what you would have to do is you would have to change the rule that says we don't use hindsight, and you would have to say now a Board has to have foresight. A Board, a fiduciary would have to have foresight to advance in their minds, to have telepathic foresight to see. But wouldn't that be per se immunity for Boards? I mean, they would always, they could disclaim any decision making with respect to the investments that they're and retirement funds of its employees if it were to just say, look, we can't possibly know what is going to happen with respect to a fund that we're investing. No, I don't think it's per se immunity at all. I think if you had a Board that had knowledge that they were hiring an investment fund full of crooks as managers. That's what's been alleged in this case. No, it's not been alleged, Your Honor. There's no allegation that the Board knew that these investment, the managers at Allianz were crooks. Look what it took to uncover this fraud. We had the most significant federal prosecutor's in the Southern District of New York, and we had the SEC uncover this fraud. Look at the guilty pleas and look at the consent decrees. That was in no way known to the Board. So you might win. I mean, you might be able to argue that and win this case eventually. But they have pled, as I understand it, that if the Board had been paying attention to how the funds were doing compared to the market, they would have known that what the statements had said about what this investment was supposed to be doing wasn't actually doing it. I mean, they've pled a lot of things about this is a riskier investment that was appropriate for a retirement fund. If you were watching the market compared to the fund, you would have been able to tell that there were lies. I mean, maybe they're wrong, and maybe you need an investigator, and it wouldn't have been, you know, the regular person wouldn't have figured this out. But I don't understand how they haven't pled enough. Your Honor, that's all hindsight. If I may respectfully suggest, everything that you just described, according to this Court's precedent, that's all hindsight. I don't think it's hindsight to say if you were watching the market and comparing it to the fund, you would have been able to figure this out in real time. That's not hindsight. It is hindsight, because nothing at all, according to their pleadings, nothing came to light until 2020, until the coronavirus. Well, they're saying that's because the Board was asleep at the wheel. I mean, maybe you can show that's wrong, but I understand them to be pleading, in part, this Board was not paying attention all the way through, not just in hindsight, but all the way through. No, Your Honor. There were 112 other, 112 other institutional investors. This is clear from the judicially noticeable materials. Hundred and twelve others, 112 other institutional investors that had been investing in these funds as well, not just what we're dealing with in this case. All of them, all of them were victims of this fraud, not just these defendants, not just these parties. That's what's out there. So you would have to issue a rule of law. And where is that on the face of the complaint? I mean, the face of the complaint, you may win, again, you may have great arguments, but I don't understand how they haven't pled enough. And I know you're saying this thing about you can't compare to index funds, but I'd like to get back to that, because it seems like that might be true on a certain kind of theory, where the theory is just you could have done better. But I think they have a more detailed theory than that. And I'm not sure what case tells us that where your theory is, the Board is asleep at the switch, they could have stayed with this other investment. They also have the allegations that this is a retirement fund, the level of risk is not okay. Look at all this very complicated hedging and all these things that are going on in this fund. I mean, it's not just there's something that would have done better. I think that's exactly what they've done. I think that's the Matusik case. I think that's what your footnote in Davis and Salesforce is. I think that's the Oshkosh case. I think that's all those 2022 cases from all the courts that say you can't, as a plaintiff, just point to a passive fund. You can't just do that. You've got to get the pleading stage. That's at the pleading stage, which is what you're asking me about. Otherwise, you are, in fact, putting a standard on boards to have the foresight to see advanced, complex criminal behavior that takes two Federal regulatory agencies to uncover. And that's why the district court said, hang on, hang on. I don't have to don blinders. If you're going to come to me, this is a very experienced district judge, if you're going to come to me and twice on two complaints, this was your question to the plaintiffs, on two complaints and pretend to me that there wasn't something else going on in the world, I'm not having it. And you're going to come to me and you're not going to tell me that these things happened. And you're not going to tell me that you gained $38 million. You're going to tell me that you lost $250 million. You can't do that in my courtroom, he says. And that's why he threw it out, and that was proper. And that's why he also said, as an alternative — now, he found he had no jurisdiction. He found he had no jurisdiction. That was the proper ruling. But that's why he also said, look, I don't have jurisdiction, but if I did, this doesn't pass because there's no benchmark, and all you're doing is tossing out an index fund. The pomp — And so do you think that there's actually no way to amend to fix this, or do you think it's some sort of penalty for — for wasting the court's time? Like, what is the basis for not giving leave to amend here? I think there's no way to fix it. Let's imagine the Pomerantz Declaration. Let's just — let's accept, for the sake of discussion, let's imagine that it had been pleaded. The Pomerantz Declaration is amounting to saying, look at an index fund. That does nothing for us. Your — your case law says that the comparator has to be a totality-of-the-circumstances comparison. It cannot be just point to an index fund on a pleading stage. Can you — can you tell me what case you think is the best case for the proposition that you're — you just articulated? Because I'd like to go back and — you've cited several different cases, and there are two issues that you've really focused on, and I'd like to know what cases you think I ought to look at for the statement that they can't just cite to a passive fund, that it has to be a comparator, and then also the sort of hindsight versus foresight issue, which I think they're kind of — they're — they're related. I mean, they're related issues. But are there two different cases you would point me to? I think you're 100 percent right that they're related here. I'm going to give you a list, if I — if I may. Sure. I know that I'm — I'm creeping up here on the time. Matusik, which is an Eighth Circuit case. Davis & Salesforce, which is your case, and it's — it's in a footnote. I take your footnotes seriously. It's footnote one. The Albert case is a Seventh Circuit case. The Smith case is a Sixth Circuit case. Then the Miners case is your case from 2022, and let's see if there's any others that come to mind. I think that will give you a — you know, a pretty good head start for diving into this. And, of course, the question about hindsight in general is the St. Vincent — the Pension case, the St. Vincent case, which you all adopted. I would submit that you all adopted in your summary affirmance in the White and Chevron case. And just — just a clarification. And you think those cases, or some of those cases, also stand for the proposition that we couldn't just allow — send back to amend the complaint? Yes. I think the Sisseton case is your authority, which says that the district court has authority here, where he's already given — where they've already amended. They had already amended. I think they amended once. Is that right? They did amend once. That's correct. And then they took five months after that before, on kind of a last-ditch effort, they threw in the Pomerantz. Counsel, I was a district court judge for several years, and I — I'm aware. — I often allowed folks to amend many, many times when necessary. Why wasn't — why couldn't we just send back in this case and say, you know, maybe you should take another look at this and allow amendment? Because I think the Pomerantz declaration, which is what's being proposed as the amendment here, is the judicial equivalent of saying it's good to have a nice breakfast. It doesn't amount to anything. And if I may say, the cases that I just offered to the court here are going to show that all that's being done here, all that's being proposed here, is not a legal fix. It doesn't save the complaint. This complaint has nothing to it. It doesn't go forward. I'm looking at the cases that you're — you told us to look at. It looks like, if we're looking at the ones from our court — Yes. — Davis is unpublished? I think Davis is unpublished. Okay. So we have a rule that we can't — But I've got Rule 32.1, right? Well, we're not going to rely on Davis as precedent. So which other case from our court?  And then — Is that a published case or an unpublished case? Minors is published. And then the other one — No, Minors, M-E-I-N-E-R. That's — M-E-I-N-E-R-S. It says Eighth Circuit in your brief. Perhaps I'm — perhaps I'm — perhaps I'm misremembering Minors then. But Davis — Davis, certainly. And then White v. Chevron. White v. Chevron is a summary affirmance of a district court case that's adopting the pension benefits St. Vincent case. Okay. The only White v. Chevron cases in your briefs are district court cases, right? That's correct, Your Honor. But it's actually — there's a citation in which it's affirmed. It's a — it's a Federal Appendix case. So you affirm it. Okay. So you don't have any published cases from our court that support the proposition you want us to treat as gospel? No, I don't — I don't think that's correct. I mean, I think — I think we go all the way back to the general — I'm sorry, counsel. Then cite it. Cite the case that you say stands for the proposition you've argued. For the fact that you can't look at hindsight? Yeah, from our — from our precedent. From our precedent. Or — or for your — your idea that you can't look at an index fund. That you can't look at index funds. Well, I think — well, I think all those cases I'm citing, Your Honor, but you're — you're telling me that because the cases are unpublished, that we're not going to rely upon them or not consider them as persuasive authority? My understanding of the rule is they're not binding precedent. But just because they're not binding precedent doesn't mean that they're not cases out there that the Court has looked at and considered the issues. If you ask me whether they're binding precedent, in that sense, I would agree with you. But they're certainly persuasive and they're reflective of your other judges from the Court considering these issues and grappling with them. And I think if we also look at the trend in the courts, these 2022 decisions, the ones that I've mentioned, are all from 2022. And they're reflecting this trend in the courts that are grappling with this question of whether we should just look to these passive funds. Should we just look to passive funds as the benchmarks, as the comparators, and we shouldn't do it? And that's what the trend is. And I think that's the one — We've taken you way over your time. I think I need to cut you off at this point. I appreciate it. Thank you, Your Honor. So we've given your opponent a bunch of extra time. Why don't we give you four minutes for rebuttal? Thank you, Your Honor. That's in addition to or? Total. Okay. Thank you. If you're still asking questions, you can keep going. I had to ask, Your Honor. Sort of in bullet points, Your Honor. First of all, of all the cases that were just cited, none addressed specifically the issue of leave to amend other than Matusse. But I think what he's saying is that it would be futile, that we don't need to grant leave to amend if you can't meet the standard. Now, I think there's a question about whether these cases require us, either cases from our own circuit or if we should be looking at cases outside our circuit, for the propositions that you have to have a comparator benchmark fund and whether or not there's this sort of reliance on hindsight versus foresight. So maybe you can talk to us about why these cases don't make it futile for you to amend a complaint. Well, if I may, Your Honor, I'd like to also discuss why the complaint on its face is sufficient in the context of those cases, but I'll also note what might be amended. The cases on hindsight, that's just a mantra that every defendant gives, is that we're just looking backwards. Well, it looks bad backwards, but it looked bad at the time, too. And that's paragraph 78 to 106 of the complaint, is that everything about this was contrary to what a prudent advisor of a retirement fund would have done at the time. Everything about the alpha side, in terms of the risk of the investment, the uncovered nature of the call options, the ability to lose a significant multiple of what was invested so the alpha overwhelms the beta, that's all known at the time. And in fact, we're quoting Callan in their white papers at one point as to how this should be. This should be something that is known and imprudent. But the other issue, the meaningful benchmark. Meaningful benchmark, actually, in a lot of these cases, this is a line of 401k cases that have developed in this circuit to say you can't just say there's a fund that did better. That's what those cases hold. And so in one of the cases they cite, there's a Vanguard fund that performed better. And the Court says that's not enough. And that's the looking backwards cases. But these cases are nothing like us. In fact, the Anderson case that they cite at 1154 makes the distinction. It says in a case where it is about strategy, where the very vehicle was inappropriate, you don't look to a meaningful benchmark. A meaningful benchmark has to be same investors, same product. Well, we don't want other highly leveraged derivatives and uncovered call options tied to the VIX. We're saying that's insane. We're not saying that there should be something that looks like that. We're saying it should look nothing like that. And so the idea of a meaningful benchmark is when you have quibbling, when you do have this, well, that fund performed better, then you have to say why is that something that the market would expect is the benchmark for that type of an investment. We don't want anything like this type of investment. It was per se imprudent. Not per se across the board. I understand this Court's rulings that you can't have a per se imprudent investment. If we allowed it to go back and amend, what would you add? What would we add? Yeah. Respectfully, Your Honor, on its face, I think that the— Let's assume that that's not enough. What would you add? That is not enough. What would you add? Well, it would depend upon the question that Your Honor thought was not sufficiently pleaded. If the issue was that there wasn't enough pleaded about the comparator, we could give more detail. Although I think that the investments that were made by these very funds, both prior to and after the imprudent investment, is a pretty good guide. In fact, this circuit's a benchmark of the Cal Ironworkers case that you can have a benchmark measure where you look at what the prudent investments in that fund would have done, as opposed to the imprudent investments. That alone, I think, gets us over the hump. But we could plead something to that effect. If the issue is that somehow—if it's Allianz, well, I think we've got it, but there's a thousand different things we could plead. Much of what opposing counsel said up here isn't even in the record about that prosecution. And so I think it depends upon, Your Honor, what the issue would be that would cause you to hopefully not think that the 200-and-some paragraphs in the complaint are insufficient. But if there is an issue, then I can—it's really just a 12b-6 issue. It's really just the standing issue when injury, in fact, can be a relative loss, which is especially conceded at pages 28 and 31 of Respondent's Brief. It's also the law. Cases that are published in the Ninth Circuit would be things like Call v. Sumitomo, California Ironworkers. These are published precedents in this circuit. But, I mean, really, you're just talking about—I'm struggling— So, sorry. If I'm remembering correctly, the specific fund comparisons to the Vanguard Total Bond Market Index Fund and the Vanguard Russell 1000 Index, those didn't appear until the Pomerantz Declaration, right? They're not in your amended complaint? Am I right about that? I thought they were, but I'd be—I do not know. I think that they're at Excerpts 520, paragraph 132 and 133. So I think that's the amended complaint. I did think, but I didn't want to misrepresent that, Your Honor. I did think they were in the complaint. But, so, you're saying there could be more explanation along the lines of the Pomerantz Declaration? Is that what you were saying in response to Judge Mendoza? The problem I'm having with the question is I'm struggling to understand how the complaint is interfaced. So you're basically saying the complaint already gave the comparators and already gave a ballpark amount of comparative loss? And also that the meaningful benchmark test that has been adopted as a motion to dismiss this test in this circuit, that's a test for in the context of another like investment. And in cases like the — it is an Eighth Circuit case, but the Miners case, that's a 2018 Eighth Circuit case, the Common Spirit case, the Salesforce case, footnote, these are cases where you're saying somebody else doing the same thing did better. And then the courts establish an extra hurdle in those sorts of cases. Well, what — why is the better the benchmark? Sure, you can always point to something that's better. There's always someone faster, better looking than we are. But why — So I think — are you saying that then the allegation in these paragraphs, in the amended complaint, the difference, the plus factor that you've alleged that you think is sufficient is the statement that had defendants instead stayed the course by investing in its broad-based bond index fund, the plans would have tens of millions of dollars more in assets? It's one, Your Honor. It's one of a number of things that I think have us over the hump. Those funds are out there. They did better. You would agree that that would not be enough or may not be enough. But the fact that you are also alleging that the board chose to go to these other more speculative funds knowingly, that that's the plus? We're not arguing that the funds could have done better. We're arguing that the funds were poisoned from the outset because they were in vehicles that exposed retirees to way too much risk. And sure enough, it could have been COVID. It could have been subprime mortgages. It could have been anything. This is a cycle that happens with some regularity, severe recessions. And even if it's not, if it's tied to the VIX, it's still going to result in significant losses. What we're saying is that from the get-go — the important thing is, Your Honor, if you're invested in stocks and bonds, those stocks and bonds may collapse. They may go down 50 percent. But they're going to come back. Apple still has value. A company generally still has value. If you have uncovered call options, you lose. There's no coming back from that. At the point that the option is called and the loss is imposed upon the fund, that loss is effectively permanent. And the only way to make it back is through other good bets. It's like coming back from a loss in Vegas, effectively. And so that's our argument, is that these are toxic from the outset. And they themselves, or any reasonable advisor, someone like Callen, should certainly know that highly leveraged derivatives and uncovered call options have an opportunity to just bust these funds. And so, yes, it is true that one way to assess the damages is to compare it to what this very same fund was doing either before or after the toxic investment. But our argument, more fundamentally as well, is that the idea of a benchmark, the idea of a meaningful benchmark has no application in a case where we are not talking about that guy ran faster, that one's prettier. That's not what this argument is. It is not pointing to a Vanguard or a Fidelity fund that significantly outpaced the fund in which these plans invested. It's that the plans invested, transparently invested— I think I need to cut you off. I figured that was coming. Thank you, Your Honor. Thank you both sides for the helpful arguments. This case is submitted.
judges: FRIEDLAND, MENDOZA, DESAI